J-A22029-18 & J-A22030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3718 EDA 2017 |

Appeal from the Order October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000948-2017,
CP-51-DP-0001428-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: S.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3722 EDA 2017 |

Appeal from the Order October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000949-2017,
CP-51-DP-0001513-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3723 EDA 2017 |

Appeal from the Order October 12, 2017

In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000950-2017,
CP-51-DP-0001514-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: M.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3724 EDA 2017 |

Appeal from the Order October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000951-2017,
CP-51-DP-0001515-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: R.Z.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3726 EDA 2017 |

Appeal from the Order October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000952-2017,
CP-51-DP-0000180-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.W., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3765 EDA 2017 |

- 2 -

Appeal from the Decree October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000948-2017,
CP-51-DP-0001428-2016

| IN THE INTEREST OF: S.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3767 EDA 2017 |

Appeal from the Decree October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000949-2017,
CP-51-DP-0001513-2016

| IN THE INTEREST OF: J.W.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3769 EDA 2017 |

Appeal from the Decree October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000950-2017,
CP-51-DP-0001514-2016

| IN THE INTEREST OF: M.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: T.J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |

- 3 -

|  | : | No. 3772 EDA 2017 |

Appeal from the Decree October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000951-2017,
CP-51-DP-0001515-2016

| IN THE INTEREST OF: R.Z.W., A CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.J.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3773 EDA 2017 |

Appeal from the Decree October 12, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000952-2017,
CP-51-DP-0000180-2017

BEFORE:   BENDER, P.J.E., NICHOLS, J., and STEVENS, P.J.E.*

MEMORANDUM BY NICHOLS, J.:            **FILED DECEMBER 18, 2018**

A.W. (Father) and T.J.A. (Mother) (collectively, Parents)[1] appeal from

the decrees and orders granting the petitions of the Philadelphia Department

---

* Former Justice specially assigned to the Superior Court.

[1] We address Parents' appeals together.  We note that Mother and Father initially filed a joint brief, which this Court struck on a motion filed by DHS. Mother and Father then filed separate briefs, although those briefs are essentially identical.

On June 14, 2018, DHS renewed its request to strike Father's brief due to Father's brief primarily discussing Mother claims, as well as Father's inclusion of purportedly waived matters.  The guardian *ad litem* joined DHS' request on June 18, 2018.  On June 29, 2018, this Court deferred a ruling on the motion to strike.

of Human Services (DHS) and involuntarily terminating their parental rights to their sons, S.M.W., born in October of 2007, A.J.W., born in August of 2009, J.W.W., born in December of 2010, M.J.W., born in January of 2013, and R.Z.W., born in January of 2017 (collectively, the Children), pursuant to the Adoption Act, 23 Pa.C.S. §§ 2101–2938, and changing the Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351. We affirm.

We have previously summarized the factual and procedural history of this matter as follows:

> On July 9, 2016[,] DHS received a Child Protective Services (CPS) report alleging that [A.J.W.] was hospitalized at the Children's Hospital of Philadelphia (CHOP) and was diagnosed with a rare form of epilepsy named, "Refractory Epilepsy." The family was visiting an unidentified person in Lehigh County when [A.J.W.] had a seizure and was transported to a hospital in Lehigh County and [then] transferred to CHOP. Mother refused medical treatment for [A.J.W.] because she believed the anti-seizure medication prescribed to [A.J.W.] was increasing his seizures. Mother attempted to remove [A.J.W.] from CHOP. CHOP staff would not allow Mother to remove [A.J.W.] as it would have endangered [A.J.W.]'s life not to receive the prescribed medication. The report stated [A.J.W.] resided in the state of Delaware. The report stated the family had an open case in Lehigh County Children and Youth Services (CYS).
>
> On July 10, 2016, D[H]S received a supplemental report alleging that [A.J.W.] was having increased seizure activity. CYS previously had physical custody of [A.J.W.] and returned physical custody to Mother on July 5, 2016[,] to make medical decisions for [A.J.W.] Mother continued to refuse treatment on the evening

Because the defects in Mother's and Father's briefs do not impede meaningful appellate review, we deny the motion to strike Father's brief and the request to quash Mother's appeal.

of July 9, 2016[,] as [A.J.W.] suffered increased seizures. The report further stated that if Mother continued to refuse medical care for [A.J.W.], he would suffer either neurological damages or sudden death. The report stated between the evening of July 9, 2016[,] and the morning of July 10, 2016, [A.J.W.] experienced at least 42 seizures. As a result of the 42 seizures, [A.J.W.]'s medical status had deteriorated. [A.J.W.] was moved to the Pediatric Intensive Care Unit (PIC) and was intubated.

On July 10, 2016, DHS obtained an Order of Protective Custody (OPC) for [A.J.W.] Approximately one week later, DHS filed a dependency petition, and a hearing was held on July 19, 2016. At the hearing, the court discovered that [A.J.W.] had three other siblings who were in need of medical treatment. Specifically, it was noted that [A.J.W.]'s siblings had extensive dental issues. At the conclusion of the hearing, the juvenile court adjudicated [A.J.W.] dependent pursuant to 42 Pa.C.S. § 6302(1) and ordered that DHS investigate the condition of [A.J.W.]'s siblings.

DHS immediately obtained protective custody of S.[M.]W., J.[W.]W., and M.[J.]W., who were born October 2007, December 2010, and January 2013 respectively. DHS filed a dependency petition on July 29, 2016, and following a hearing, the juvenile court adjudicated S.[M.]W., J.[W.]W., and M.[J.]W. dependent.

*In Interest of A.W.*, 187 A.3d 247, 248-49 (Pa. Super. 2018) (citations and footnotes omitted).

Subsequently, Mother gave birth to R.Z.W. in January of 2017. DHS obtained an OPC immediately after his birth. The court adjudicated R.Z.W. dependent on February 2, 2017.

On September 27, 2017, DHS filed petitions to involuntarily terminate Mother's and Father's parental rights to the Children and change the Children's permanency goals to adoption. On October 12, 2017, the trial court conducted a hearing on DHS' petitions. The Children were all represented by a guardian *ad litem*, Patrice Lagenbach, Esq., and legal counsel, Nghi Duong Vo, Esq., at

the hearing. DHS presented the testimony of forensic psychologist William Russell, Ph.D.; Lakesha Akines, DHS case manager; and Camie Turner, foster care supervisor at the Village. Mother, who was represented by Lindsay M. Palmer, Esq., presented the testimony of Barbara Bradford, a visitation supervisor at the Village. Father was represented by Craig B. Sokolow, Esq.[2] Neither Mother nor Father testified at the hearing.

By decrees and orders entered October 12, 2017, the trial court involuntarily terminated Mother's and Father's parental rights to the Children, and changed the Children's permanency goals to adoption. On November 13, 2017, Mother and Father filed timely notices of appeal,[3] as well as concise statements of errors complained of on appeal.

On appeal, both Mother and Father raise the following issues:

1. Whether the [t]rial [c]ourt erred when it found that the Department of Human Services[,] by clear and convincing evidence[,] had met its burden to terminate Appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2),

_____

[2] Father's counsel attempted to present the testimony of a clinical psychologist, John Marcello Gentry, Ph.D., who performed a parenting capacity evaluation on Mother and Father. During the examination to qualify Dr. Gentry, the trial court determined that the doctor did not have the expertise to testify as to his parental capacity evaluation. Mother and Father have not challenged the trial court's determination that Dr. Gentry could not testify regarding his evaluation.

[3] Because the thirtieth day after the entry of the trial court's orders fell on a Saturday, the November 13, 2017 filings were timely. *See* 1 Pa.C.S. § 1908.

§ 2511(a)(5), and § 2511(a)(8) and change[d] the goal to adoption?[4]

2. Whether the trial court erred when it found that the termination [of] parental rights was in the Child[ren]'s best interests and would not cause irreparable harm and that the Department of Human Services had met its burden pursuant to 23 Pa.C.S.A. § 2511(b)?

3. Whether the trial court erred by failing to adhere to the **In Re L.B.M.**[5] decision by appointing a child advocate with insufficient notice?

4. Whether the trial court erred in violating parents' due process rights by exhibiting bias and misapplying the rules of evidence?

Mother's Brief at 3; Father's Brief at 3.

Parents first contend that the trial court erred in its evaluation of Section 2511(a). Parents assert that "[o]ther states have found that mere marijuana use, without evidence that it is harmful to the present and future ability to care for the child, is not a sufficient basis for termination of parental rights." Mother's Brief at 16; Father's Brief at 14. Mother also argues that she completed her goals and that the Children could have been reunited with her.

---

[4] While both Mother and Father's questions involved on appeal suggest that the trial court erred in changing the Children's permanency goals to adoption, neither party includes any meaningful argument regarding the goal change in the argument portion of their brief. Therefore, we conclude this claim is waived. **See** Pa.R.A.P. 2119(b); **Giant Food Stores, LLC v. THF Silver Spring Development, L.P.**, 959 A.2d 438, 444 (Pa. Super. 2008) ("The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Failure to do so constitutes waiver of the claim.") (citations omitted).

[5] **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality).

Mother's Brief at 16; Father's Brief at 15. Parents conclude, "[h]ad the trial court appropriately evaluated the parents' compliance with case goals, the [C]hildren would have been reunified with them. Accordingly, Parents suggest that "it was an abuse of discretion for the trial court to find that grounds existed to terminate the[ir] parental rights under [Section] 2511(a)." Mother's Brief at 17; Father's Brief at 15.

We review these claims mindful of our well-settled standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (brackets, internal quotation marks, and citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court involuntarily terminated Parents' parental rights to S.M.W., A.J.W., J.W.W., and M.J.W. pursuant to Section 2511(a)(1), (2), (5), (8), and (b). The court involuntarily terminated Parents' parental rights to R.Z.W. pursuant to Section 2511(a)(1), (2), (5), and (b). Here, we will focus our analysis on Section 2511(a)(2), *see B.L.W.*, 843 A.2d at 384, which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

- 10 -

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

> As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .
>
> This Court has addressed incapacity sufficient for termination under § 2511(a)(2):
>
>> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has noted that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope

- 11 -

for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Instantly, in terminating Parents' rights pursuant to Section 2511(a)(2), the trial court noted that both Mother and Father missed drug screens and had drug screens rejected. Trial Ct. Op., 3/20/18, at 7-8. Further, Parents failed to sign consents needed for future services and evaluations for the Children. *Id.* at 8. The court also noted that when the Children were removed from Parents' care, none of the children were enrolled in school, nor were there any records of any type of home schooling. *Id.* At visits, Parents were uninterested in the Children's schoolwork and there were six incidents that required staff or security to de-escalate Father's responses to staff. *Id.* Parents did not progress to unsupervised visits. *Id.* at 9. Additionally, the court credited the expert testimony of Dr. Russell that Mother exhibited a pattern of neglect coupled with poor judgment. *Id.*

Our review of the record reveals that both Mother and Father had identical FSP goals. The goals consisted of undergoing mental health and drug and alcohol treatment; obtaining housing; signing consents for treatment and services; maintaining employment and providing documentation; attending medical and dental appointments; following through with parental capacity evaluations; and visitation. N.T., 10/12/17, at 195. DHS witnesses acknowledged that Parents completed or progressed with some of their FSP goals. *Id.* at 212-18.

With respect to drug and alcohol treatment, Mother completed a course of drug and alcohol therapy at the Wedge in April 2017. *Id.* at 213. Father also attended drug and alcohol treatment at the Wedge, but DHS received no documentation showing he successfully completed the program. *Id.* at 191.

However, Parents were inconsistent with respect to appearing for random drug screens. Between June 2017 and October 2017, DHS requested five random drug screens. *Id.* at 183. Parents both appeared for drug screens on June 29, 2017, but left without taking a drug screen. *Id.* at 184, 190-91. On October 3, 2017, Parents were requested to provide drug screens, but both indicated they could not come in that day. *Id.* at 184, 190.

Mother had a drug screen rejected on August 18, 2017. *Id.* at 184. Further, Mother tested positive for cocaine in June of 2017. *Id.* at 182. Mother claimed she must have eaten something and would reconnect with drug and alcohol treatment. *Id.* at 183. Father had a sample rejected for being too "thick" on September 12, 2017, and due to the creatine level of the samples on June 9 and 21, 2017. *Id.* at 190-91. Based on the foregoing, Ms. Akines, the DHS case manager, testified that Parents were not in compliance with the FSP goal of completing drug and alcohol treatment and maintaining sobriety. *Id.* at 194.

With regard to housing, Mother and Father resided together in a one-bedroom apartment at the time of the hearing. *Id.* at 214-15. Parents installed two sets of bunk beds in the bedroom for Children. *Id.*

With respect to Mother in particular, Dr. Russell opined that there were significant issues that the Children faced that Mother could not adequately address. *Id.* at 88. Specifically, Dr. Russell observed that the Children's dental and medical needs were not cared for, and that Mother places her own wants above the Children's needs.[6] *Id.* at 89-90. Dr. Russell concluded that Mother could not provide safety and permanency for the Children. *Id.* at 87. Dr. Russell suggested that Mother showed "a pattern of systemic neglect" of Children's needs and continued to show poor judgment.[7] *Id.* at 93.

Dr. Russell further noted Mother claimed to homeschool the Children but had no plan or program, and felt that the Children being happy was more important than their education. *Id.* at 90-91. Rather than homeschooling, Mother was "unschooling," allowing the Children to learn in any manner that they could, without any teaching or instruction. *Id.* at 94.

_____

[6] We reiterate that A.J.W. suffers from refractory epilepsy which requires medication and a special diet. Additionally, it was discovered that S.M.W. and J.W.W. both suffered from significant tooth decay. The trial court noted that Father attempted to treat A.J.W.'s seizures with marijuana oil and that "Father admitted to administering marijuana oil to S.M.W., J.W.W. and M.J.W. to keep them calm." Trial Ct. Op., 3/20/18, at 3.

[7] Mother also posted a "go fund me video." The video is not included in the certified record. However, the spoken portion of the video is included in the transcript from the February 2, 2017 adjudicatory hearing regarding R.Z.W. It consists of Mother detailing the history of her case and requesting funds to obtain private counsel. The transcript of the video reveals Mother claimed that A.J.W. was "medically kidnapped," and that the Children were placed in care because she tried to sign her son out of the hospital against medical advice. N.T., 2/2/17, at 11-13.

As to Children's continuing educational needs, Children entered school once in foster care and showed significant speech, learning and cognitive delays. *Id.* at 91. Parents failed to support the Children's education while Children were in foster care. For example, S.M.W. did not attend school until he was in the second grade, and attended only after he was placed in foster care. *Id.* at 197. Initially, he was doing both second grade and kindergarten work to catch up. *Id.* Although he could not read when he started school, he progressed to being on target for his grade. *Id.* at 198. Ms. Akines testified he has excelled in reading and math and is very excited to read and talk about his day. *Id.* at 197.

DHS recommended that Parents discuss the Children's education experiences with them during the visit. However, Parents did not want to do homework with S.M.W. during visits, asserting that it interfered with their visit. *Id.* at 196, 199-200. Further, S.M.W. would appear for visits ready to read a story. *Id.* at 279. When Father showed a lack of interest, S.M.W. responded by shutting down and stopped asking to do his school work. *Id*. When S.M.W. sought to discuss his schooling with his parents, Father told S.M.W. that "real learning starts when you forget everything you learned." *Id.* at 199. Parents' attitude towards school was particularly concerning because the Children were not enrolled in school at all when they came into care. *Id.* at 200.

With respect to visitation, Parents' visitation was always supervised. *Id.* at 172. Initially, visits were held at the foster care agency, the Village. At visits, the supervisor needed to redirect Father because he swung one child around by their ankles. *Id.* at 178. Father eventually stopped, but told the supervisor, "[t]hese are my kids. I'm going to do what I want to do with them. This is how I play with them." *Id.* at 282. The supervisor was concerned that a child would get hurt during the visits as Father became rough with the Children and Mother could not get him to stop. *Id.* at 281, 295. All of the visitation supervisors expressed concerns about Parents' ability to redirect their behavior during visits. *Id.* at 180.

Throughout the Children's time in foster care, Ms. Akines noted approximately six incidents where multiple agency, facility staff, or security were required to de-escalate a situation with Parents. *Id.* at 193. At a visit less than six months prior to the termination hearing, Father became upset because, during an intake, a therapist did not speak to him immediately. *Id.* at 173. He requested to speak to the supervisor and director, who became involved and attempted to calm him down. *Id.* at 174-75. As a result of Father's actions, the Village reported they would not offer further supervised visits. *Id.* at 175. Instead, they recommended therapeutic visits. *Id.* Ms. Turner, a visitation supervisor, believed that the therapeutic visits would alleviate the issues associated with the excessive roughness at the visits, but she believed security would still need to be available. *Id.* at 293-94.

Accordingly, instead of progressing to unsupervised visitation, Parents regressed to therapeutic visits. *Id.* at 195-96.

In sum, the record supports the trial court's conclusion that Parents are incapable of parenting the Children and that they cannot or will not remedy their parental incapacity under Section 2511(a)(2). Parents failed to comply with their goals. They continued to evade drug screens. They have shown an indifference to Children's education. More troublingly, Parents could not safely visit with their children even in a supervised setting. It is apparent that neither Mother nor Father will remedy this situation at any point in the foreseeable future. Accordingly, we discern no abuse of discretion in the trial court's conclusion, *see R.J.S.*, 901 A.2d at 513, and Parents' arguments—namely, that their use of marijuana did not warrant termination of their parental rights and that they complied with several aspects of their FSP's—do not warrant relief.

Next, Parents argue the trial court erred in terminating their parental rights pursuant to subsection 2511(b) because the Children have a bond with Parents and want to remain in their care. Mother's Brief at 19, Father's Brief at 18. Parents assert that Children have a strong bond with Parents and there would be irreparable harm to the Children if the parental bond was severed. Mother's Brief at 19, Father's Brief at 18. Parents fault the trial court for concluding that there would be no irreparable harm to the Children if their bond with Parents was severed. Additionally, Parents claim that the trial court

improperly concluded the bond with Parents was unhealthy. Mother's Brief at

20, Father's Brief at 19.

Section 2511(b) states:

> **(b) Other considerations.--**The court in terminating the rights
> of a parent shall give primary consideration to the developmental,
> physical and emotional needs and welfare of the child. The rights
> of a parent shall not be terminated solely on the basis of
> environmental factors such as inadequate housing, furnishings,
> income, clothing and medical care if found to be beyond the
> control of the parent. With respect to any petition filed pursuant
> to subsection (a)(1), (6) or (8), the court shall not consider any
> efforts by the parent to remedy the conditions described therein
> which are first initiated subsequent to the giving of notice of the
> filing of the petition.

23 Pa.C.S. § 2511(b).

It is well settled that:

> [S]ection 2511(b) focuses on whether termination of parental
> rights would best serve the developmental, physical, and
> emotional needs and welfare of the child. As this Court has
> explained, Section 2511(b) does not explicitly require a bonding
> analysis and the term "bond" is not defined in the Adoption Act.
> Case law, however, provides that analysis of the emotional bond,
> if any, between parent and child is a factor to be considered as
> part of our analysis. While a parent's emotional bond with his or
> her child is a major aspect of the subsection 2511(b) best-interest
> analysis, it is nonetheless only one of many factors to be
> considered by the court when determining what is in the best
> interest of the child.

>> [I]n addition to a bond examination, the trial court can
>> equally emphasize the safety needs of the child, and
>> should also consider the intangibles, such as the love,
>> comfort, security, and stability the child might have
>> with the foster parent. Additionally, this Court stated
>> that the trial court should consider the importance of
>> continuity of relationships and whether any existing

> parent-child bond can be severed without detrimental
> effects on the child.

**In re Adoption of C.D.R.**, 111 A.3d 1212, 1219 (Pa. Super. 2015) (internal quotation marks and citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." **In re Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." **In re K.Z.S.**, 946 A.2d 753, 762 (Pa. Super. 2008) (citation omitted).

This Court has noted that

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal quotation marks and citations omitted).

Thus, the court may emphasize the safety needs of the child. *See K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

In concluding that involuntarily terminating Parents' parental rights would best serve the Children's needs and welfare, the trial court observed that Parents had a bond with the Children. Trial Ct. Op., 3/20/18, at 11. Further, the court noted the gains the Children made in foster care, as well as the fact that the Children are currently in the same pre-adoptive home. *Id.* at 11-12. The court concluded termination of Parents' parental rights met the Children's needs and welfare and that there would be no irreparable or detrimental harm to the Children to terminate Parents' parental rights. *Id.* at 12.

The record supports the trial court's conclusion. Ms. Aikens testified that when asked, the Children expressed that they want to go home with

Parents. N.T., 10/12/17, at 244. Ms. Akines observed a bond between the Children and Parents. *Id.* at 244-45. Children also call Parents Mom and Dad and call foster mother "Ms. [R.]" *Id.* at 244.

However, Ms. Akines also believed it would be harmful for the Children to be removed from the foster parent. *Id.* at 222. Ms. Akines opined the Children have a bond with the foster parent and noted they speak highly of her. *Id.* Ms. Akines observed positive interactions between the Children and the foster parent, who is able to control their behavior, attend to their needs, and give them one-on-one attention. *Id.* at 222-23. Ms. Akines believed the Children view the foster parent as their primary caregiver. *Id.* at 224. Ms. Akines recounted that the foster parent was instructed not to pick up the Children from the visitor room because the Children run to the foster parent, which results in Mother being upset. *Id.* at 222. Ms. Akines also noted the Children have a bond with each other and are placed in the same foster home. *Id.* at 223-24. Ms. Akines opined it would not harm the Children beyond repair if Parents' rights were terminated. *Id.* at 225-26.

Ms. Turner, the visitation supervisor, testified the Children were equally bonded to Parents and the foster parent. *Id.* at 292. Ms. Turner believed the Children enjoyed visits with Parents, but she could tell the foster parent met their emotional needs. *Id.*

Following our review, we conclude that the trial court appropriately considered the bond between the Children and Parents, as well as the bond

between the Children and their foster parent. The court properly considered the facts that brought the Children into foster care in determining that the bond between Parents and the Children were unhealthy, as well as the impact that terminating Parents' rights would have on the welfare of the Children. Because the record and law supports the trial court's conclusion that terminating Parents' rights meets the Children's needs and welfare, we affirm its conclusion that termination of Parents' parental rights is appropriate pursuant to Section 2511(b). *See K.K.R.-S.*, 958 A.2d at 535; *See K.Z.S.*, 946 A.2d at 763.

In their third issue, Parents assert the trial court erred in failing to appoint legal counsel for the Children in advance of the termination hearing. They acknowledge the court appointed legal counsel for the Children, but assert that counsel's appointment, shortly before the hearing, was improper. Mother's Brief at 20-21, Father's Brief at 19-20. Parents describe the appointment as the "equivalent to merely checking off a box . . . ." Mother's Brief at 20, Father's Brief at 19. Further, they fault counsel for the Children, claiming he failed to take the time to understand the complexity of the case and failed to "effectively advocate for his clients and lacked candor with the trial court when he advised that he was ready to proceed." Mother's Brief at 21, Father's Brief at 20. They similarly fault the trial court for failing to continue the hearing based on the appointment of counsel shortly before the hearing. Mother's Brief at 21, Father's Brief at 20.

As to the appointment of counsel to represent a child in involuntary termination proceedings, 23 Pa.C.S. § 2313(a) provides:

§ 2313. Representation.

**(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

In **L.B.M.**, our Supreme Court addressed "whether 23 Pa.C.S. § 2313(a), which mandates the appointment of counsel for children involved in contested involuntary termination of parental rights ("TPR") proceedings, is satisfied by the appointment of a guardian *ad litem* ("GAL") provided that the GAL is an attorney." **L.B.M.**, 161 A.3d at 174. The **L.B.M.** Court did not overrule this Court's holding in **In re K.M.**, 53 A.3d 781 (Pa. Super. 2012), that a GAL who is an attorney may act as legal counsel pursuant to section 2313(a) as long as the dual roles do not create a conflict between the child's legal and best interests. The Court defined a child's legal interests as being "synonymous with the child's preferred outcome," and a "child's best interests" as "what is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees." **Id.** at 174 & n.2

- 23 -

Subsequently, in *In re T.S.*, 192 A.3d 1080 (Pa. 2018), the Supreme Court held that the issue of whether a child's statutory right to counsel was denied is an alleged error that is non-waivable. *T.S.*, 192 A.3d at 1087. In *T.S.*, our Supreme Court held that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. *Id.* at 1092. The Court explained:

> if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed "to represent the child," 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings.

*Id.* at 1092-93.

In a series of recent cases, this Court has vacated and remanded termination cases where it is apparent that appointed counsel for the children failed to speak with the children to determine their preferred outcome. *See In re T.M.L.M.*, 184 A.3d 585 (Pa. Super. 2018) (vacating and remanding for further proceedings when six-year-old child's preference was equivocal and the attorney neglected to interview the child to determine whether legal and best interests were in conflict); *In re Adoption of D.M.C.*, 192 A.3d 1207 (Pa. Super. 2018) (vacating and remanding for further proceedings where the children's legal counsel had a limited conversation over the telephone with a child who was almost thirteen years old, but the child's preferred outcome was

not clear from the record, and counsel had no conversation to ascertain the younger, four-year-old child's preferred outcome); *In re Adoption of M.D.Q.*, 192 A.3d 1201 (Pa. Super. 2018) (vacating and remanding where this Court was unable to ascertain from the record whether the appointed counsel represented the subject children's legal interests and ascertained their preferred outcomes, but appeared to have speculated as to their preferred outcomes, and this Court could not determine the children's legal interests from the record, either).

Notwithstanding Parents' argument, the Children's legal counsel, Attorney Vo, represented the Children appropriately. It is apparent that counsel met with Children, determined their preferred outcomes, and expressed the Children's preferred outcome to the Court. Specifically, counsel argued regarding the Children's preferred outcomes as follows:

> MR. VO: Yes. I saw the children together, not individually. And during the interview, first, Ms. Akines brought them in. And then foster mom came in. They don't seem to be intimidated or (unintelligible) presence of those adults. So, that's my -- so, my conclusion is they wish free -- they're free to express their wish.
>
> [R.Z.W.] cannot talk yet. So, I -- I don't know. I didn't ask h[im] any question. Now, I asked them they know why they're here. They didn't seem to know why they're here. I asked whether they know what term -- termination of parental rights is. They don't seem to understand.
>
> I asked them, do they know why DHS -- no. I asked them DH -- I told them DHS -- they are in this situation because DHS believed the bio parents couldn't take care of them. [S.M.W.] agreed with DHS a little. [S.M.W.] -- [S.M.W.] -- [S.M.W.] agreed with DHS. (Unintelligible) okay. [S.M.W.]

Now, they all say they are comfortable staying with [the foster mother, Ms. R.] But they call her Ms. R[.], and they call [m]om and [d]ad -- their bio parents ["]Mom and Dad.["] And I told them after today they may not be able to see their bio parents again, so they all say they -- they are sad if they could not do that. They all say that, okay.

Now, I told them, if they have to -- if they have to do one of the two things, either go back home to their bio parents or stay here with Ms. R[.], [J.W.W.] was the most emphatic he wants to go home. [S.M.W.], he hesitated a little. He took like three or five seconds to say he wanted to go home.

[M.J.W.] at first say he doesn't know. That's the first round. And then on the first round of asking, [A.J.W.] also say he wanted to go home with Mom and Dad. So, then, I wait for a while and then, you know, I asked them a second round so that -- to make sure that I don't influence them or anything like that.

So, they still say the same thing. [J.W.W.], [S.M.W.], and [A.J.W.] say they all want to go home. [M.J.W.] this time say he want to stay with [Ms. R.] But he mumbled. We had to ask him really what he -- now, what he say he want to do, stay with R[.] That's my report. Now, my -- so, [M.J.W.], I leave it to Ms. Langenbach argument. I'm not going to argue on behalf of [M.J.W.] because that's his best interest, so I'm not to touch on that.

[R.Z.W.], I'm -- you know, I have no position because I cannot talk -- I couldn't talk to him. But the other three I have -- I have to advance their legal interest. And I have to say that they have right of freedom of association. So, if they want to be with their parents, that's their right. That's their legal right. They also have the right to (unintelligible) the -- the -- their legal needs are there for their bio parents. And they also -- and also, if they don't make it, they may lose any kind of right to inheritance that they may have if -- that they may if they weren't terminated. That's all I have.

N.T., 10/12/17, at 363-66.

Here, counsel's representation of the Children complied with the

requirements of Section 2313. Accordingly, we conclude the trial court did

not err when it appointed counsel for the Children shortly before the hearing, or when it did not continue the hearing based on the timing of the appointment.

In their fourth issue, Mother and Father assert the "[t]rial court erred in violating parents' due process rights by exhibiting bias and misapplying the rules of evidence."  Mother's Brief at 22, Father's Brief at 20.  After citing general case law regarding the due process clause, recusal, judicial bias, requests for continuance, sequestration, hearsay as being inadmissible, and the effect of court orders, Parents include the following argument:

> It was clear from the inception of this case that Judge Younge overreached in maintaining control of this case.  The case should have been dismissed for lack of jurisdiction when A.J.W. received the medical attention he needed.  Rather, the court took mother into custody to coerce the father into bringing the other children physically into the jurisdiction of her court.  All children were removed from the parents' care.  At the immunization hearing, Judge Younge acted with contempt toward the parents' attorneys, and allowed her law clerk to preside over the remainder of the hearing.  When the matter was submitted for interlocutory appeal, Judge Younge should have been minimally involved in the dependency case.  Instead, when mother gave birth to another child, she removed that child from mother's care.  Once the "go fund me" video was released,[8] and played in open court, Judge Younge should have recused herself.  Rather, she retained

---

[8] **See** *supra* note 7.  After reviewing the video at the February 2, 2017, hearing, Mother stated that the trial judge was in a "horrific mood" and was yelling, and Mother referred to her case as a debacle and a sham.  **Id.** at 14.  Neither Mother nor Father requested recusal at the February 2, 2017 hearing.  Rather, Parents agreed to take the video down.  **Id.** at 20-21.

- 27 -

jurisdiction over the matter and allowed the city solicitor to swiftly move toward termination.

It does not seem accidental that Judge Younge failed to appoint a child advocate until last minute. Her rulings throughout the case and TPR hearing demonstrated her lack of objectivity. It was evident that the Judge had made up her mind prior to the termination hearing. Seemed as though the Judge had made up her mind prior to the termination hearing. Given that the youngest child had been in care for less than 9 months at the TPR hearing, the matter could easily have been listed as a status of goal change. However, as early as June 8, 2017, the Judge planned for an all-day termination hearing.

The Judge's denial of the request for continuance was unreasonable, biased, and ill-willed. This is also true of her evidentiary rulings, continually in favor of the city and against parents. Her failure to implement her own discovery order, honor rules of evidence, give appropriate weight to all parties' testimony, or sequester witnesses all demonstrate her violation of parents' due process rights.

Accordingly, the trial court erred in denying parents their due process rights and continually exhibiting bias toward them.

Mother's Brief at 24-25, Father's Brief at 23-24.[9]

"A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." **Commonwealth v. Tejada**, 161 A.3d 313, 317 (Pa. Super. 2017) (citation omitted). "Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues." **Brooks–Gall v. Gall**, 840 A.2d 993,

---

[9] We observe that Parents stated this issue somewhat differently in their Rule 1925(b) statements. We, nevertheless, find that Parents preserved their challenges regarding this issue.

997 (Pa. Super. 2003) (citation omitted) (recognizing that dependency proceedings implicate due process concerns). "It is well settled that procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." **S.T. v. R.W.**, 192 A.3d 1155, 1161 (Pa. Super. 2018) (internal quotation marks and citations omitted). "The right of a litigant to in-court presentation of evidence is essential to due process; in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." **M.O. v. F.W.**, 42 A.3d 1068, 1072 (Pa. Super. 2012) (citations omitted).

Here, Parents make vague assertions of bias without specifically identifying how the trial court erred. With respect to the court's denial of a continuance to allow counsel for the Children more time to prepare, the denial was appropriate as counsel adequately represented the Children's interests. Additionally, while Parents fault the court for "favoring" DHS over the parents, the record confirms that the court appropriately considered the facts before it and reached a decision consistent with the evidence presented.

For the foregoing reasons, we affirm the decrees and orders of the trial court involuntarily terminating Mother's and Father's parental rights to the Children, and changing the Children's permanency goals to adoption.

Decrees and orders affirmed. Motion to strike denied. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/18/18</u>